UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CAMILLE L. THOMAS,                    )
                                      )
                    Plaintiff,        )
                                      )
        vs.                           )          09 C 6705
                                      )
THE CITY OF CHICAGO and               )
DAN MURPHY,                           )
                                      )
                    Defendants.       )

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This case comes before the Court on Defendant City of Chicago's (the "City")

motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the

reasons stated below, the motion is granted.

## BACKGROUND

From September 1, 2004, until September 14, 2007, the City employed Plaintiff

Camille L. Thomas ("Thomas") as a Staff Assistant in the Financial Services Section

(the "Section") of the Department of Fleet (the "Department"). The Department

manages the vehicle fleets of all City departments and the Section manages the

Department's financial needs. As a Staff Assistant, Thomas was responsible for, among

other tasks, logging invoices into a computer program on a daily basis. This dispute

arises from Thomas's complaints of gender discrimination and retaliation by her supervisor, Dan Murphy ("Murphy").

**Thomas's Work Performance Before her Internal Complaint**

When Thomas was hired, she reported to Charmaine Grandau ("Grandau"). In 2005, Grandau gave Thomas an evaluation score of 4 out of 5. After Grandau retired in 2005, Linda Henderson ("Henderson") replaced Grandau for approximately six to nine months. In August 2005, Henderson evaluated Thomas and gave her an evaluation score of 3.8. Henderson noted that Thomas was capable of doing excellent work, but needed to reduce the time she spent on auditing. Henderson further noted that Thomas was unprofessional and had a problem with authority. Henderson explained that Thomas went wherever and did whatever she wanted without prior authorization. In March 2006, Henderson again evaluated Thomas and gave her an evaluation score of 4, but reiterated her prior concerns.

On February 1, 2006, Murphy was hired as the Manager of Finance. In October 2006, Murphy told his Section, including Thomas, to use discretion when having personal conversations at work. Murphy and Henderson both observed that Thomas spoke loudly and socialized with friends at work. On one occasion, Murphy asked Thomas to minimize her talking, laughing, and giggling and Thomas responded, "I'm not going to change who I am." According to Thomas, other men and women

socialized, but Murphy did not instruct them to stop talking. Based on her observation, Thomas claims that Murphy discriminated against her as an individual.

In November 2006, Thomas complained to Murphy that she had too much work and needed help. To determine whether Thomas had too much work or needed to better manage her time, Murphy asked Thomas to log her work during the day in fifteen minute intervals. Murphy also asked everyone else in the Section to complete a time log. Based on Thomas's time log, Murphy concluded that Thomas was inefficient and partially attributed Thomas's inefficiency to her socializing.

On November 17, 2006, Murphy asked Thomas to enter an important invoice into the computer. Thomas replied that she was busy and would input the invoice the following day. Murphy verbally reprimanded Thomas for not inputting the invoice that day and for failing to maintain her time logs for the week.

In January 2007, tension grew between Henderson and Thomas, which led to Murphy taking over as Thomas's direct supervisor. Murphy often spent time with Thomas at her desk working on a project or training her to better manage her time.

The 2006 fiscal year ended in February 2007. Around that time, Murphy asked Thomas to work overtime because she was behind in her work. When Thomas refused, other employees worked to help Thomas. Ultimately, Thomas failed to timely input over $740,000 worth of invoices before the end of the 2006 fiscal year. As a result, the

Department lost the 2006 funding for the unprepared and unpaid invoices and had to fund the invoices from the upcoming year's fiscal budget.

Before February 2007, Deputy Commissioner Fattore ("Commissioner Fattore") issued a memorandum stating that no vacations would be approved and sick time would only be approved with sufficient evidence of illness until after the 2006 fiscal year ended in February 2007. Notwithstanding the memorandum, the City honored the four days of vacation time, from February 13 to February 17, 2007, that Thomas had previously requested. On February 8, 2007, Thomas called in sick and requested to take a personal day on February 9, 2007, so she could go car shopping. Because of Commissioner Fattore's memorandum, Murphy denied the request for a personal day. Without approval, Thomas took the day off on February 9, 2007, and was not paid for that day. Thomas later edited her time sheet to change February 9, 2007, to a sick day so she would be paid for the day, even though Thomas could not recall seeing a doctor on that day or having a doctor's note to justify her absence.

**Thomas's Violence in the Workplace Complaint**

In February 2007, Thomas witnessed an event between a fellow female employee, Angela Gutierrez ("Gutierrez"), and Murphy. Gutierrez made an error and Murphy responded by pointing his finger at her and nudging her. On February 2, 2007, Thomas filed a Violence in the Workplace complaint against Murphy which stated that

she witnessed Murphy nudge Gutierrez. Thomas also complained that Murphy harassed her, sent her intimidating e-mails, stalked her, and spoke to her with a threatening tone. Thomas never mentioned gender discrimination or sexual harassment in her complaint. That same day, Henderson overheard Murphy ask Thomas about some invoices and Thomas respond "well, do you want to do it?" Henderson submitted a witness statement concerning this incident during the investigation of Thomas's complaint. Ultimately, the investigator determined that insufficient evidence existed to conclude that Murphy violated the City's policies.

**Thomas's Work Performance After her Internal Complaint**

In March 2007, Henderson and Murphy jointly evaluated Thomas's work performance and gave her an evaluation score of 2. Murphy created notes that formed the basis for his evaluation and used the notes to explain to Thomas the areas that needed improvement. Murphy explained that Thomas needed to improve her timeliness, legibility, accuracy, organization, and prioritization. After the March 2007 evaluation, Thomas was placed on probation for three months and on a Performance Improvement Plan ("Plan"). Because of her poor evaluation score, Thomas did not receive a pay raise. Thomas complained to then-Commissioner of Fleet Management, Howard Henneman ("Commissioner Henneman"). Thomas told Commissioner Henneman about the work she did for the Department and that her work never came

back to her with errors. Thomas never complained to Commissioner Henneman about gender discrimination, sexual harassment, or retaliation.

In June 2007, Thomas had not accomplished her Plan's goals and received an evaluation score of 2.4. The City again placed Thomas on probation and, by August 2007, Thomas still failed to meet her Plan's goals. In the August 2007 evaluation, Murphy stated that Thomas's shortcomings prevented him from implementing department-wide processes because her responsibilities were, in some cases, a critical first step. Murphy believed that, between June and August 2007, Thomas's performance had deteriorated because of her constant socializing with other co-workers.

On September 10, 2007, Thomas informed Murphy that she would not finish inputting all of the invoices by the end of the day. Shortly thereafter, Murphy walked by Thomas's desk while she was talking on the telephone and entering invoices into the computer. Murphy asked Thomas whether she was unable to timely enter the invoices because she was on the telephone rather than focusing on her work. Thomas responded, "I ain't getting off the phone for nobody." Unbeknownst to Murphy, Thomas was speaking to her son who called to confirm he had just gotten home from school. The following day, Murphy reprimanded Thomas for her insubordination and warned her that he would not tolerate further insubordination. Thomas immediately went to Commissioner Henneman and asked to transfer to a different location. Thomas did not

mention sexual harassment, gender discrimination, or retaliation. When Commissioner Henneman refused to transfer Thomas, she stormed out of his office.

**Events Immediately Preceding Thomas's Termination**

Murphy believed that Thomas was abusing the Sick Leave Policy because she called in sick the day after her evaluations in March, June, and August 2007. On Wednesday, September 12, 2007, the day after Murphy reprimanded Thomas for insubordination, Thomas missed work. That morning, Thomas went to the hospital because she had an anxiety attack. Thomas was discharged from the hospital that same day, but the doctor instructed her not to return to work for the rest of the week. Even though Thomas knew that the Sick Leave Policy required her to inform Murphy of the reason for her absence from work, she never called him. Finally, on Friday, September 14, 2007, Thomas's boyfriend called Murphy and told him that Thomas had been in the hospital and would return to work the following Monday or Tuesday.

Murphy recommended that Commissioner Henneman terminate Thomas because he believed that she was abusing the Sick Leave Policy, her performance had not improved over the last eight months, and Thomas spent too much time socializing at work. At the time Murphy recommended termination, he did not know that Thomas had an anxiety attack. On September 14, 2007, Commissioner Henneman terminated Thomas's employment.

**Complaints About Murphy**

Thomas testified that Murphy treated her worse than other female employees. According to Thomas, Murphy approached her first thing in the morning and asked her to complete several tasks and then often came by her desk to assign additional tasks or check on her progress. Thomas described Murphy as "nasty" and said that Murphy called her ignorant. Even though Thomas believes that Murphy did not treat other female employees the same way he treated her, Thomas said that Murphy had "a slight tendency for nastiness with other females." Thomas testified that Murphy spoke with male employees in a pleasant tone.

Murphy supervised many male employees, including Jun Pagcatipunan ("Pagcatipunan"), Burgos Manicia ("Manicia"), and Gregg Sponsky ("Sponsky"), and female employees, including Liliana Diaz, Joann Thompson, Bruni Torres, and Amanda Garuso Gooch. None of these employees ever complained about Murphy.

Gutierrez, however, filed two complaints against Murphy, in 2009 and 2010, for harassment and violence in the workplace. According to Gutierrez, Murphy yelled at her and other female employees. Gutierrez testified that she witnessed Murphy following Thomas while she completed certain tasks. Henderson also filed a complaint against Murphy because he yelled at her.

Murphy also yelled at, and reprimanded, male employees. Henderson witnessed Murphy yell at Pagcatipunan and reprimand Sponsky on several occasions. Murphy complained about Sponsky's inefficiency and gave him negative reviews because of his absenteeism, tardiness, and insubordination. Vernita Ray, a female Personnel Assistant, does not believe that Murphy treated men differently than he treated women.

**Thomas's Complaint**

On or about September 13, 2007, Thomas filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). On July 16, 2008, Thomas amended her charge to encompass her termination. On December 20, 2010, Thomas filed a four-count Amended Complaint against the City and Dan Murphy (collectively, "Defendants"), alleging violations under Title VII of the Civil Rights Act. Count I alleges that Defendants engaged in gender discrimination when Murphy created a sexually hostile environment for women and Defendants refused to give Thomas a pay raise. Count II alleges that Defendants retaliated against Thomas by refusing to give her a pay raise after she filed a Violence in the Workplace complaint against Murphy. Count III alleges that Defendants engaged in gender discrimination by terminating her employment. Count IV alleges that Defendants retaliated against Thomas by terminating her employment because she complained about Murphy to Commissioner Henneman. The City now moves for summary judgment.

As a preliminary matter, the Court dismisses Defendant Murphy from the case because Thomas never served him with the summons and complaint and an individual employee cannot be held liable under Title VII.  Fed. R. Civ. P. 4(m); *Shockley v. Svoboda*, 342 F.3d 736, 738-39 (7th Cir. 2003).

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Protective Life Ins. Co. v. Hansen*, 632 F.3d 388, 391-92 (7th Cir. 2011).  A genuine issue of material fact exists when, based on the evidence, a reasonable jury could find in favor of the non-moving party.  *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010).  A court construes all facts and draws all reasonable inferences in favor of the non-moving party.  *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009).

## DISCUSSION

### I.    The Gender Discrimination Claims: Counts I and III

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a).  Title VII generally forbids two types of employment discrimination: discrete acts of discrimination, such

as termination from employment, and acts that create a hostile workplace. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010).

## A.    Count I

In Count I, Thomas alleges a hostile workplace claim based on Murphy's differential treatment of female and male employees. To establish a hostile workplace claim under Title VII, Thomas must demonstrate that: (1) she was subjected to harassment; (2) because of her sex; (3) the harassment was severe or pervasive enough to create a hostile work environment; and (4) a basis for employer liability exists. *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 993-94 (7th Cir. 2011). For purposes of this Opinion, the Court assumes, without deciding, that Murphy's conduct amounted to harassment and concludes that Thomas cannot establish the second and third elements of a hostile workplace claim.

First, a jury could not reasonably infer from the undisputed facts that Thomas's gender motivated the harassment. The plaintiff must attribute a gender character or purpose to the challenged conduct. *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999). To establish the conduct's gender character or purpose, the plaintiff can demonstrate that the harasser used sex-specific and derogatory terms or offer direct comparative evidence regarding how the harasser treated members of both sexes. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (explaining

method of proof for less obvious, same-sex harassment). Without question, Murphy made no gender-based comments or gestures and Murphy's conduct was wholly related to Thomas's work. As such, Thomas relies solely on Murphy's differential treatment of men and women. The evidence shows that Murphy raised his voice with several women and, on one occasion, pointed his finger at, and nudged, a woman. Although less important, incidents directed at others, and not Thomas, are relevant in demonstrating the existence of a hostile work environment. *Smith v. Sheahan*, 189 F.3d 529, 534 (7th Cir. 1999). However, the evidence also shows that Murphy supervised several women who did not complain about his behavior. Further, according to Thomas, Murphy treated her worse than other women, which suggests that Murphy did not target Thomas because of her gender. Indeed, Thomas, herself, framed Murphy's behavior as a form of "individual discrimination." Moreover, Murphy's uncouth behavior was not directed solely at women, as Murphy also got angry with, and yelled at, Sponsky and Pagcatipunan. This case lacks any persuasive connection between Murphy's behavior and Thomas's gender. Based on the undisputed facts, Thomas has not put forth sufficient evidence that Murphy harassed her because of her gender.

Second, a jury could not reasonably infer from the undisputed facts that the harassment was severe or pervasive enough to constitute a hostile work environment. To qualify as hostile, the environment must be both subjectively and objectively

offensive. *McPherson v. City of Waukegan*, 379 F.3d 430, 438 (7th Cir. 2004). The record leaves no doubt that Thomas found Murphy's behavior subjectively offensive, so the Court focuses on whether Murphy's behavior was objectively offensive. When evaluating the objective offensiveness of a work environment, the court considers all circumstances, including frequency and severity of the conduct, whether the conduct was humiliating or physically threatening, and whether the conduct unreasonably interfered with the employee's work performance. *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 677-78 (7th Cir. 2005). It is not enough that a supervisor "fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor." *Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 858 (7th Cir. 1999).

This case is similar to *Racicot* where the Seventh Circuit affirmed summary judgment in favor of the employer. 414 F.3d at 677-78. In *Racicot*, the plaintiff's co-workers used vulgar language in the plaintiff's presence and occasionally cursed and yelled at the plaintiff. 414 F.3d at 677-78. The *Racicot* court found that the co-workers' conduct reflected "run of the mill uncouth behavior" rather than "an atmosphere permeated with discriminatory ridicule and insult." *Id.* Here, the undisputed facts demonstrate that Murphy followed or watched Thomas as she completed a task, raised his voice or conveyed a harsh tone when speaking to her, and called her "ignorant." As in *Racicot*, these acts do not amount to a hostile work

environment and are insufficient to create an atmosphere permeated with discriminatory ridicule and insult. Additionally, Murphy's acts were relatively non-severe, as he never physically touched, threatened, or humiliated Thomas. Thomas also accuses Murphy of "stalking" her. While stalking is objectively offensive, *Minor*, 174 F.3d at 858, the record does not support Thomas's characterization of Murphy's behavior. Murphy's close oversight, while perhaps overbearing, does not equate to stalking. Thomas paints Murphy as an obnoxious and rude supervisor, but the undisputed facts demonstrate that Thomas was not subjected to objectively severe or pervasive harassment.

### B.    Counts I and Count III

In Counts I[1] and III, Thomas alleges claims for gender discrimination based on her inability to receive a pay raise and her termination. A plaintiff can prove gender discrimination under either the direct or indirect method. *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720 (7th Cir. 2008).

### 1.    Direct Method

Under the direct method, the plaintiff must present a "convincing mosaic" of direct or circumstantial evidence that could permit a jury to infer intentional discrimination by the decision maker. *Petts*, 534 F.3d at 720. Circumstantial evidence must point directly to a discriminatory reason for the employer's action. *Id.* Courts

---

[1] Thomas's first count seemingly alleges claims for a hostile work environment and gender discrimination. Accordingly, the Court evaluates Thomas's first count under both standards.

have recognized three types of circumstantial evidence, but only the first two types are relevant in this case. First, plaintiff can present evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which a jury can infer discriminatory intent. *Id.* at 721. Second, plaintiff can present comparative evidence showing that similarly situated employees outside the protected class systematically received better treatment. *Id.*

Thomas relies on the following as circumstantial evidence of intentional discrimination: (1) Manicia received a raise and Thomas did not; (2) Thomas received better evaluations from other supervisors before Murphy evaluated her; and (3) Murphy yelled at Thomas, but never yelled at the male employees.

Based on the undisputed facts, no reasonable jury could infer intentional discrimination from Thomas's circumstantial evidence. First, even though Thomas complains that Manicia received a raise while she did not, she does not demonstrate that she and Manicia are similarly situated. Manicia and Thomas did not perform the same duties and no facts suggest that Manicia, like Thomas, failed to timely complete his work or focus on his tasks, defied authority, or abused the Sick Leave Policy. Second, while Thomas previously received higher evaluation scores from other evaluators, Henderson, a female evaluator, also expressed that Thomas was inefficient,

unprofessional, and defiant. Further, Murphy and Henderson jointly evaluated Thomas and gave her the low evaluation score. Since Murphy and Henderson jointly evaluated Thomas, Thomas cannot suggest that her evaluation score was the byproduct of Murphy's gender discrimination. Finally, Thomas's suggestion that Murphy yelled at her and never yelled at male employees is proven untrue by other evidence. Specifically, Henderson witnessed Murphy get angry with, and yell at, two male employees. Accordingly, Thomas cannot demonstrate gender discrimination under the direct method.

### 2. Indirect Method

Under the indirect method, the plaintiff establishes a prima facie case of gender discrimination by proving that she: (1) is a member of a protected class; (2) was satisfying her employer's legitimate expectations; (3) was subjected to an adverse employment action; and (4) was treated differently than a similarly situated person outside the protected class. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002).[2] Once the plaintiff establishes a prima facie case, the defendant must then articulate a non-discriminatory reason for the adverse action. *Id.* at 876. If the

---

[2] The first and third prongs of the indirect method are not in dispute, as Thomas is a member of a protected class and was terminated from her employment. The court also assumes that Thomas suffered an adverse employment action when she did not receive a raise.

defendant proffers a non-discriminatory reason, the plaintiff must prove that the stated reason is merely a pretext for discrimination. *Id.*

Here, Thomas cannot establish a prima facie case of gender discrimination for two reasons. First, no reasonable jury could conclude that Thomas, an insubordinate and inefficient employee, was satisfying her employer's legitimate expectations. *See, e.g., Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 478 (7th Cir. 2010); *O'Neal v. City of Chi.*, 588 F.3d 406, 410 (7th Cir. 2009); *Tomanovich v. City of Indianapolis & Ind. Dep't of Transp.*, 457 F.3d 656, 666 (7th Cir. 2006). As far back as August 2005, and again in March 2006, Henderson warned Thomas that she needed to work more efficiently, act more professionally, and respect her superiors. Thomas continued to exhibit inefficiency and unreliability as an employee when, at the end of the 2006 fiscal year, she was behind on her work and refused to work overtime. Ultimately, Thomas's inefficiency resulted in her failure to prepare over $740,000 worth of invoices by the end of the 2006 fiscal year. Even though Thomas was put on probation in March 2007, Thomas failed to meet her performance goals by the time of her evaluations in June and August 2007. Additionally, Thomas displayed disrespect for Murphy. For example, when Murphy reprimanded Thomas for socializing with co-workers, Thomas responded, "I'm not going to change who I am." Also, during Thomas's last week of work, she told Murphy, "I ain't getting off the phone for nobody." Finally, Thomas

revealed her disregard for the Sick Leave Policy when she was absent from the office for two days before her boyfriend informed Murphy of the reason for her absence. The undisputed facts demonstrate that Thomas was not meeting her employer's legitimate expectations.

Second, no reasonable jury could conclude that Thomas was treated less favorably than a similarly situated male employee. Importantly, Thomas fails to identify any male employee who, like her, was insubordinate, inefficient, and abused the Sick Leave Policy. *Everroad*, 608 F.3d at 478-79 (explaining that the plaintiff must demonstrate that she was treated differently than an employee engaging in similar conduct).

Finally, even if Thomas could establish a prima facie case of gender discrimination, the City offers non-discriminatory reasons why Thomas did not earn a pay raise and why Commissioner Henneman terminated Thomas's employment. Thomas did not earn a pay raise because of her low evaluation score in March 2007, which was supported by her poor behavior and inefficiency. Further, because Thomas's work performance had not improved and Murphy believed that Thomas was abusing the Sick Leave Policy, Commissioner Henneman terminated her employment upon Murphy's recommendation. Thomas does not dispute her inefficiency, absences from work, or insubordination and presents absolutely no evidence demonstrating that the

City's proffered non-discriminatory reasons are a pretext for gender discrimination. Accordingly, the Court grants summary judgment in favor of the City on Thomas's claims for gender discrimination (Counts I and III).

## II. The Retaliation Claims: Counts II and IV

Title VII also prohibits an employer from retaliating against an employee for conduct that is protected under the Act. 42 U.S.C. § 2000e-3(a). Murphy asserts two retaliation claims under Title VII. In Count II, Thomas alleges that Defendants refused to give her a pay raise after she filed a Violence in the Workplace complaint against Murphy. In Count IV, Thomas alleges that Defendants terminated her employment because she complained about Murphy to Commissioner Henneman.

Thomas may prove retaliation under either the direct or indirect method. *Tomanovich*, 457 F.3d at 663. Under the direct method, Thomas must prove that she engaged in a statutorily protected activity, suffered a materially adverse action by her employer, and a causal connection between the activity and the adverse action. *Id*. Alternatively, under the indirect method, Thomas must establish a prima facie case by proving that she engaged in a statutorily protected activity, met her employer's legitimate expectations, suffered an adverse employment action, and similarly situated employees who did not engage in the statutorily protected activity were treated more favorably. *Id*. If Thomas establishes a prima facie case, the burden shifts to the City

to articulate a non-discriminatory reason for the adverse action.  *Id.*  If the City proffers a non-discriminatory reason, then Thomas must demonstrate that the reason is pretextual.  *Id.*

Thomas's retaliation claims fail, under the direct or indirect method, because no reasonable jury could conclude that she engaged in a statutorily protected activity.  To engage in statutorily protected activity, Thomas's complaints must indicate that the discrimination occurred because of her gender.  *Tomanovich*, 457 F.3d at 663.  Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient.  *Id.*  Thomas's Violence in the Workplace complaint and complaints to Commissioner Henneman made no mention of gender discrimination or retaliation and in no way attributed Murphy's behavior to her gender.  Accordingly, Thomas did not engage in a statutorily protected activity.

Even if Thomas engaged in a statutorily protected activity, Thomas's retaliation claims still fail under the direct method because no reasonable jury could find a causal connection between Thomas's activities and the adverse actions.  First, the undisputed facts demonstrate that Thomas did not receive a raise because Henderson and Murphy gave her a low evaluation score, not because she filed an internal complaint against Murphy.  Thomas's low evaluation score was amply supported by Thomas's poor

behavior and inefficiency. Also significant, Henderson and Murphy evaluated Thomas together, so that Murphy did not have complete control over Thomas's evaluation score. Thus, Murphy could not retaliate against Thomas by giving her a low, unwarranted score. Second, no facts suggest that Commissioner Henneman terminated Thomas because of her complaints about Murphy. Even though Murphy recommended that Commissioner Henneman terminate Thomas, Thomas does not suggest that Murphy knew of her complaints to Commissioner Henneman. Moreover, Thomas does not dispute the fact that she acted disrespectfully to Murphy and violated the Sick Leave Policy the week she was fired. For these reasons, Thomas cannot establish a causal connection between her complaints and the adverse employment actions.

Finally, even assuming Thomas engaged in a statutorily protected activity, Thomas's retaliation claims also fail under the indirect method because, as discussed above, she cannot prove that she was satisfying her employer's legitimate expectations, that a similarly situated employee was treated more favorably, or that the City's non-discriminatory reasons for the adverse employment actions are pretextual. Accordingly, the Court grants summary judgment in favor of the City on Thomas's retaliation claims (Counts II and IV).

## CONCLUSION

For the foregoing reasons, this Court grants the City's motion for summary judgment.

_____
Charles P. Kocoras
United States District Judge

Dated:   August 25, 2011